Israel E. TAYLOR, Petitioner,

v.

Stephen DALSHEIM, Respondent.

No. 78 Civ. 2967 (KTD).

United States District Court,
S. D. New York.

Oct. 18, 1978.

Israel E. Taylor, plaintiff, pro se.

Louis J. Lefkowitz, Atty. Gen., New York City, for respondent; Donald Sticklor, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Petitioner, Israel E. Taylor, was accused of the shooting death of James Stone in New York City on November 15, 1973. He

proceeded to trial before Justice Peter McQuillan, Justice of the Supreme Court, New York County, and a jury on February 5, 1976. At the trial, petitioner elected to testify in his own defense. On February 17th the jury convicted him of manslaughter in the first degree. He was thereafter sentenced, by Justice McQuillan, to an indeterminate term of imprisonment not to exceed twenty years. The petitioner is presently serving this term in New York's Ossining Correctional Facility.

Upon direct appeal the Appellate Division-First Department, unanimously affirmed the conviction without opinion on November 10, 1977.[1] The Court of Appeals denied leave to appeal in an order dated January 24, 1978, and again, upon reconsideration, in an order dated April 11, 1978.

Petitioner, having exhausted his state remedies, now seeks a writ of habeas corpus based upon the allegation that his right to due process has been violated. More particularly, petitioner claims that he was denied a fair trial as a result of the Assistant District Attorney's cross-examination of him concerning his post-arrest silence.

Petitioner also raises other questions of an evidentiary nature which need not be set forth at length in this opinion.

Upon review of the trial transcript, I am convinced beyond any reasonable doubt that the petitioner was afforded a fundamentally fair trial. Moreover, I find that any prosecutorial misconduct falls short of fundamental constitutional error and, consequently, outside the purview of a writ of habeas corpus.

## The People's Case:

James Stone, the victim of the fatal shooting, was the owner of Stone's Tire Service located on Seventh Avenue in New York City. On November 23, 1973, Stone, together with his employee Grady White, drove to Green's Auto Parts shop, located a few blocks from his own shop, in order to purchase some auto supplies. Mr. White,

---

1. It should be noted from the outset that petitioner's allegations on the direct appeal to the Appellate Division parallel those asserted in the instant action.

who was driving the truck, double parked directly in front of Green's shop. Stone then left the truck and headed towards Green's, leaving White to attend the truck. Thereafter, White spotted the petitioner, Israel Taylor, recognizing him as a previous customer of Stone's Tire Service. Apparently, Mr. Taylor had certain work performed on his car at Stone's. Subsequent to this work at Stone's, a dispute arose between Taylor and Stone concerning the bill for this work. Suffice it to say that as a result of this dispute, White was able to identify Taylor, that day, in front of Green's. White also testified that Taylor was at the time wearing a brown leather coat.

Before the victim entered Green's shop, Taylor apparently called to him. The victim turned to face Taylor and then Taylor, pulling a gun from his coat, fired at Stone.

As the shot was fired, Messrs. Watson and Newkirk, who were conversing a short distance away, turned to the direction of the shot. They saw Stone, whom they recognized as a local businessman, backing away from a man in a leather coat. They then saw the man in the leather coat put something in his waistband and "cooly" walk away from Stone who was now staggering as a result of his fatal wound. Thereafter, the police arrived and, upon investigation, discovered that just a short distance from the shooting a man in a brown leather coat had been seen getting into a "gypsy" cab. Within moments the police radioed the cab's description and plate number to local mobile units and the cab was stopped. The petitioner was found inside the cab with the brown leather coat folded over his lap and was immediately arrested.

### The Defendant's Case:

The petitioner, testifying on his own behalf, admitted his presence at the scene of the shooting, but gave quite a different account of the events leading up to the fatal incident.

The petitioner testified that he was the intended victim on November 23 and that Stone was the aggressor. Indeed, he testified that Stone, White and a third man approached him in front of Green's and that Stone then grabbed him. He said that this attack was prompted by a prior dispute with Stone over a bill for certain work done on Taylor's car at Stone's shop. He also testified that White, standing next to Stone, said "let's blow him away" and then White reached into his waistband for a gun. At that point Taylor, in an effort to flee from the trio, pushed Stone into White, turned and ran. Petitioner, in fear of his life, flagged a cab and was arrested when the cab was subsequently stopped by the police.

Petitioner also testified that this was not his first confrontation with Stone concerning his auto bill. He testified that sometime in August of 1973, Stone openly threatened Taylor demanding payment. Moreover, Taylor stated that Stone actually recovered part of the amount owed him at that time.

### Analysis:

Petitioner's principal contention is that the prosecutor violated his right to due process by questioning him on cross examination about his post-arrest silence and again referring to his silence upon summation to the jury. The essence of petitioner's allegation is that since he never told his trial version of the shooting incident to the police after his arrest, the prosecutor improperly argued to the jury that his trial version was merely a recent fabrication, not worthy of belief.

On cross examination the following colloquy occurred between the prosecutor and the petitioner:

[By the Prosecutor]: Mr. Taylor, did you ever tell Detective Corrigan, or for that matter any other police officer, the story you told the jury today?

A.  No.

Q.  You did not?

A.  No.

Q.  This occurred in November of '73; is that correct?

A. Yes, Sir. (Tr. 689).[2]

In summation the prosecutor argued that petitioner had "lied through his teeth" with testimony "designed solely to pass the buck" (Tr. 846) and he "tailored his testimony to the facts that he could not . . . get around." (Tr. 861).

It is not disputed that at the time of trial, February, 1973, the law of New York provided that where a defendant's testimony relating to the critical events involved in the case is patently inconsistent with the testimony produced by the prosecution, thus causing the defendant's credibility to be the central factual issue, his post-arrest silence could be the proper subject of cross examination for purposes of impeachment. *People v. Rothschild,* 35 N.Y.2d 355, 361 N.Y. S.2d 901, 320 N.E.2d 639 (1974). *See also Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970). Indeed, the instant case would appear to present just such a situation. The petitioner testified that he never shot the victim Stone. Instead, he claims that it was Stone and White who attacked him and it was White who pulled the gun that killed Stone. The prosecutor charges, however, that it was Taylor who was the aggressor and it was he who pulled the gun and killed Stone.

The problem arises, however, in that the Supreme Court, on June 17, 1976, in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), held that the use of a defendant's silence either at the time of his arrest or after receiving *Miranda* warnings,[3] violates the Due Process Clause of the Fourteenth Amendment. The issue now becomes what retroactive effect, if any, the holding in *Doyle* has upon those cases pending on direct appeal when the *Doyle* doctrine was enunciated.

Petitioner argues that the *Doyle* doctrine must be applied to his case since it was on direct appeal to the Appellate Division at the time the new rule was enunciated. It is his position that any retroactive application of the doctrine mandates a new trial. I disagree.

Assuming for the moment that the *Doyle* doctrine were to be applied retroactively to the case at bar, it is apparent that not every *Doyle* violation mandates the disturbance of a criminal conviction. Indeed, in *Doyle* the Supreme Court recognized the possibility that an impermissible reference by a prosecutor to a defendant's post-arrest silence may constitute nothing more than harmless error. *Doyle v. Ohio, supra,* 426 U.S. at 619–20, 96 S.Ct. 2240. *See also Leon v. Kuhlmann,* 443 F.Supp. 50, at 53–56 (S.D.N.Y.1977). The doctrine of harmless error, simply stated, provides that where a federal constitutional error has been committed, yet is found to be harmless beyond a reasonable doubt, the conviction will not be disturbed. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Reviewing the testimony in the instant case, I am convinced that the jury would have chosen to convict the petitioner even if the prosecutor had made no reference to the petitioner's post-arrest silence. Indeed, the evidence of petitioner's guilt was overwhelming. Moreover, reference to petitioner's silence constituted only a minute portion of the prosecutor's cross examination and was the sole express reference made during the entire trial. The "reference" allegedly made by the prosecutor upon summation concerning petitioner's silence was indeed subtle. In fact, upon review of the summation, I seriously doubt whether anyone, including the prosecutor, was aware that any reference concerning defendant's post-arrest silence had been made. Thus, since these references constituted such a

---

**2.** The defense counsel's objection to this line of questioning was sustained as soon as it was made. Unfortunately, the damaging answer came before the objection. It should be noted, however, that defense counsel requested no further relief upon the objection being sustained; neither a curative instruction, a motion to strike nor a motion for a mistrial. Had such curative relief been requested, I am sure that Justice McQuillan, an able trial judge, would have been able to properly instruct the jury and correct the impermissible reference.

**3.** *See United States v. Hale,* 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).

**264**

small part of the trial and in light of all the evidence offered, I find that the prosecutor's actions constituted mere harmless error and do not warrant the issuance of a writ of habeas corpus. *Chapman v. United States,* 547 F.2d 1240, 1250 (5th Cir. 1977); *Rothschild v. State of New York,* 388 F.Supp. 1346 (S.D.N.Y.1975). *See also Leon v. Kuhlmann, supra,* 443 F.Supp. at 56.

Accordingly, I need not reach the issue of whether the *Doyle* doctrine should be applied retroactively to the instant case. *Leon v. Kuhlmann, supra,* 443 F.Supp. at 56.

The balance of petitioner's allegations charge certain prosecutorial misconduct. Upon review of these allegations as well as the trial transcript, I am convinced that these allegations are baseless. Moreover, these allegations, even if true, fail to raise any question of constitutional proportion.

Accordingly, petitioner's application for a writ of habeas corpus is denied.

So ordered.